## COMMONWEALTH *VS.* ERIC WALKER.

Suffolk. November 8, 2002. - December 13, 2002.

Present: MARSHALL, C.J., GREANEY, SOSMAN, & CORDY, JJ.

*Constitutional Law,* Search and seizure, Probable cause, Assistance of counsel. *Search and Seizure,* Probable cause. *Probable Cause. Practice, Criminal,* Assistance of counsel, Agreement between prosecutor and witness, Capital case. *Evidence,* Bias of government witness, Cross-examination, Conversation between husband and wife.

Affidavits supporting the Commonwealth's application for a warrant to search a criminal defendant's residence provided a substantial basis for concluding that evidence specified on the face of the warrant application could be found in the defendant's residence. [249-250]

At a criminal trial, the defendant's counsel provided effective assistance by adequately preparing, and executing, a reasonable trial strategy in cross-examining a principal prosecution witness (the defendant's wife). [250-251]

At a criminal trial, the judge properly admitted in evidence a nonprosecution agreement between the Commonwealth and the defendant's wife as redacted to avoid references about the truthfulness of her information; further, there was no impermissible vouching by the prosecutor for the wife's credibility. [252-253]

At a criminal trial, the judge did not abuse his discretion in barring the defendant from attempting to show bias on his wife's part by asking her in cross-examination whether she knew that, by agreeing to testify in the Commonwealth's favor under a nonprosecution agreement, she avoided potential life sentences for murder in the first degree and for armed robbery. [253-254]

There was no merit to a criminal defendant's contention that the admission at trial of a police detective's testimony recounting a private conversation between the defendant and his wife was in violation of the marital disqualification provision set forth in G. L. c. 233, § 20. [254]

INDICTMENTS found and returned in the Superior Court Department on July 17, 1998.

A pretrial motion to suppress evidence was heard by *John C. Cratsley,* J., the cases were tried before him, and a motion for a new trial, filed on August 1, 2002, was heard by him.

*Joseph A. Hanofee* for the defendant.

*Paul B. Linn,* Assistant District Attorney, for the Commonwealth.

GREANEY, J. A jury convicted the defendant of armed robbery and murder in the first degree by reason of both deliberate premeditation and felony-murder (with armed robbery as the predicate felony). A motion for a new trial was denied by the trial judge without an evidentiary hearing. Represented by new counsel on appeal, the defendant argues that (1) probable cause did not exist to support the issuance of a search warrant for his residence; (2) his trial counsel provided constitutionally ineffective assistance of counsel by inadequately cross-examining a principal prosecution witness, Yashica Walker, the defendant's wife; (3) the nonprosecution agreement between the Commonwealth and Yashica should not have been admitted in evidence because it had been inadequately redacted and "read in its entirety . . . constituted impermissible vouching by the Commonwealth, directly and inferentially for the truthfulness of [Yashica's] . . . testimony"; (4) the judge improperly prevented the defendant's trial counsel from showing bias on Yashica's part by not allowing him to ask her in cross-examination about the life sentences that could be imposed on her for convictions of murder in the first degree and armed robbery; and (5) the judge erred in allowing a police detective to recount a private conversation between Yashica and the defendant that was subject to the marital disqualification set forth in G. L. c. 233, § 20. We find no error and no basis to exercise our authority pursuant to G. L. c. 278, § 33E. Accordingly, we affirm the order denying the defendant's motion for a new trial and the judgments of conviction.

The Commonwealth's evidence disclosed the following. On the evening of March 2, 1998, the victim was murdered by a single gunshot to the head, and a large sum of money was stolen from him. The victim was killed in his room on the third floor of a rooming house at 6 Kingsdale Street in the Dorchester section of Boston. The victim's body was found the next day in a wooded area in Quincy. The body had been wrapped in two plastic bags and several layers of bed linen.

The police investigation brought them, on March 4, 1998, to the room occupied by the defendant and his wife, Yashica, on the third floor of 6 Kingsdale Street. The defendant's room was across the hallway from the victim's room. The defendant told

the police that he last saw the victim on March 1, 1998. Four days later, on March 8, 1998, the defendant and his wife moved out of their room at 6 Kingsdale Street to Yashica's family home at 16 Radcliffe Road in the Mattapan section of Boston. When visited by police at his new residence on March 18, the defendant again denied any knowledge of the crime and explained to police that he and his wife had moved out of their room at 6 Kingsdale Street because Yashica had been afraid since the victim's death. The police subsequently ascertained that fingerprints recovered from the plastic bag that covered the lower half of the victim's body matched the defendant's fingerprints, and that a fourth print on the bag matched the print of Yashica's right big toe.

On the evening of March 25, the police obtained a warrant to search 16 Radcliffe Street. During the search, they found a passbook for a Citizens Bank savings account in the defendant's name. Although the defendant lacked regular employment, Citizens Bank records showed that $1,940 in cash had been deposited into his account on March 3, 1998, the day after the murder, and that the defendant had personally made six cash withdrawals from the account from March 9 to March 23. Yashica was not authorized to make withdrawals from this account.

That same evening (March 25), the defendant agreed to go to the Boston police headquarters for a formal interview. After advising the defendant of his Miranda rights, Detective Dennis P. Harris asked the defendant whether he had ever seen any bags in the basement at 6 Kingsdale Street. The defendant answered that he had seen clear plastic bags in the basement once, but he repeatedly denied that he had ever touched them. The detectives informed the defendant that his fingerprints had been found on one of the bags covering the victim's body. The defendant initially accused the police of trying to trick him, but ultimately banged the table and said, "Talk about bad luck." He then claimed that a young, dark-skinned woman with long braids had come to his apartment on the afternoon of March 2, and asked for some bags because she was helping the victim to move. Recalling the bags in the basement, the defendant asserted that he had escorted the lady downstairs and handed her two of the bags.

Meanwhile, another police detective was interviewing Yashica. This detective told Detective Harris that Yashica had implicated the defendant in the murder. Detective Harris returned to the defendant, repeated the Miranda warnings, and informed the defendant of Yashica's statements. The defendant responded, "I don't know why she's saying that stupid shit; she wasn't even there."

Yashica testified at trial pursuant to a nonprosecution agreement. On the evening of March 2, she arrived home from work at about 6:30 or 7 P.M. Later that evening, she had several conversations with the defendant, at first by telephone and later in person. After one of these conversations, the defendant left their room for about five or ten minutes. When he returned, Yashica followed him across the hall to the victim's room. Both of them were wearing gloves. The door to the victim's room was already open. Inside, Yashica saw the victim's body lying on the floor, wrapped in sheets and plastic bags. She also saw that there was blood on the floor. She and the defendant carried the body downstairs to the trunk of an automobile and drove to a remote area, where they dumped the body. Yashica denied that she had been involved to any greater extent in the murder.

In his defense, the defendant maintained, and argued to the jury, that Yashica was lying, and that she had murdered the victim, using the defendant to assist her in carrying and disposing of the body.

1. We reject the defendant's claim that the affidavit supporting the application for the search warrant of his residence at 16 Radcliffe Road failed to establish probable cause. To establish probable cause to search, the facts contained in an affidavit, and reasonable inferences that may be drawn from them, must be sufficient for the magistrate to conclude "that the items sought are related to the criminal activity under investigation, and that they reasonably may be expected to be located in the place to be searched at the time the search warrant issues." *Commonwealth* v. *Donahue*, 430 Mass. 710, 712 (2000). A reviewing court gives considerable deference to the magistrate's determination of probable cause. See *Commonwealth* v. *Upton*, 394 Mass. 363, 377 (1985).

The two affidavits of police officers that supported the issu-

ance of the search warrant in this case, when examined under settled standards, see *Commonwealth* v. *James*, 424 Mass. 770, 777-778 (1997), establish probable cause. The facts contained in the affidavits include the following: (1) the defendant lived across the hallway from the victim on the third floor of the building at 6 Kingsdale Street; (2) the victim was seen at work the day before the murder with approximately $1,500 cash; (3) the defendant was slow to answer the door when police knocked to question him on March 4, 1998; (4) on March 8, 1998, the defendant and Yashica moved from 6 Kingsdale Street to 16 Radcliffe Road, even though their rent had been paid at Kingsdale Street until the end of the month; (5) the defendant provided inconsistent explanations as to the reason for this move; (6) the defendant's fingerprints were found on plastic bags on the victim's body; (7) the defendant had served sentences for firearm violations and robbery; (8) the victim had been known to wear gold jewelry that was not found with the victim or recovered from his room; (9) a bloody shoe print, from a shoe with a "Vibrant type" sole, had been found on a pillow recovered from the crime scene. The affidavits by the police provided a substantial basis for concluding that evidence specified on the face of the warrant application (the murder weapon, bloody clothing, the gold jewelry, or the shoes with the "Vibrant type" sole) could be found in the defendant's residence at 16 Radcliffe Road.

2. There is no basis to conclude that the defendant's trial counsel provided him with constitutionally ineffective representation under the standard set forth in *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992). The defendant argues that his trial counsel's failure to develop and comment on testimony regarding the victim's injury (the angle of the gunshot wound, the path of the bullet, the absence of powder burns at the point of entry); the comparable heights of the victim, the defendant, and Yashica; the lack of forced entry; the fact that the victim had shown $1,500 to coworkers on the day he was murdered; the fact that the defendant had no way of knowing that the victim had any money that day; and the fact that the victim was wearing only a bathrobe and a "vanity cap," deprived him of the substantial defense that Yashica was the perpetrator of the rob-

bery and the murder.[1] The specific theory that the defendant
would have had his trial counsel develop from these facts ap-
pears to be that Yashica had shot the victim after having been
enticed into the victim's room for sexual favors in exchange for
cash. The defendant argues that his trial counsel's failure force-
fully to argue this theory to the jury is especially egregious
because, at the conclusion of the Commonwealth's case, his
trial counsel successfully moved for a required finding of not
guilty on the theory of joint venture, thus limiting the
defendant's jeopardy to that of a principal in the crime.

In his memorandum of decision denying the defendant's mo-
tion for a new trial, the judge stated that the defendant's trial
counsel made "reasonable tactical decisions in developing
evidence via cross examination and structuring that information
into his summation." According to the judge, the defendant's
trial counsel had "pointedly accused Yashica Walker of killing
[the victim], emphasizing her motive and opportunity to commit
the murder." The judge recalled that he had been "impressed
with [the] content, organization, and zealous delivery" of the
defendant's trial counsel's closing argument. The judge
concluded that the defendant was "fully and competently
represented by his experienced trial counsel." As stated by the
judge, "[t]he mere fact that one attorney would now assemble
the factual components of an attack on a cooperating witness's
credibility differently than trial counsel does not establish [trial
counsel's] ineffectiveness." See *Commonwealth* v. *Peloquin*,
437 Mass. 204, 210 (2002).

Our independent review of the performance of the defendant's
trial counsel confirms these observations by the judge.
Considered apart from unfounded assumptions, the evidence
relied on to demonstrate on appeal alleged incompetence on the
part of the defendant's trial counsel was no more likely than the
evidence trial counsel emphasized to shift the blame for the
murder to Yashica. The defendant's trial counsel prepared, and
adequately executed, a reasonable trial strategy. See *Com-
monwealth* v. *Coonan*, 428 Mass. 823, 827 (1999).

---

[1]The above listed facts, except the comparable heights of the victim, the
defendant, and Yashica, and that the victim had shown $1,500 in cash to three
coworkers on the day of his murder, were in evidence at trial.

3. We are not persuaded by the defendant's claim that the nonprosecution agreement, admitted in evidence over the general objection of the defendant's trial counsel, was not sufficiently redacted and constituted impermissible vouching under the principles described in *Commonwealth* v. *Ciampa*, 406 Mass. 257, 261-264 (1989). The defendant points to the facts that the agreement, as redacted, still contained the date it was entered into (April 1, 1998 [two years before the trial]), as well as language stating that "[i]f the District Attorney learns that the information or testimony which you provide . . . is not complete, then this agreement may be declared to be null and void." Taken together, argues the defendant, this information may have permitted the jury to infer improperly that (1) the police had spent two years verifying the truth of Yashica's version of events; (2) the prosecutor still allowed her to testify; and thus (3) her testimony had to be "complete," that is, truthful.[2]

There is no question that the nonprosecution agreement was admissible. See *Commonwealth* v. *Marrero*, 436 Mass. 488, 500 (2002). The general danger to be avoided in the admission of agreements of this sort is that the jury may believe that, because the validity of the agreement depends on the truthful nature of the testimony, the Commonwealth, in effect, has guaranteed the truthfulness of the witness's testimony. See *id.* Thus, references to a witness's obligation to tell the truth, or provisions that suggest that the Commonwealth has special knowledge as to the veracity of the witness's testimony, should be redacted, on request. See *Commonwealth* v. *Ciampa*, *supra* at 262.

Repeated references in the nonprosecution agreement to the truthfulness of Yashica's testimony were redacted. The defendant's trial counsel made no specific objection to the words in the agreement providing that Yashica's information be complete. We agree with the Commonwealth that the word "complete" in this context did not imply truthfulness, but required that Yashica tell the police everything she knew about the crimes. Thus, the agreement indicated that it could be voided if the Commonwealth discovered material facts that Yashica knew of, but had omitted from her story. The requirement of

---

[2]All but one reference in the agreement that Yashica's testimony was to be "truthful," be given "truthfully," or other words to that effect, were redacted.

"completeness" did not suggest that the Commonwealth possessed any special ability to discern whether she was telling the truth. These reasons may account for the lack of any request by the defendant's trial counsel to redact the provisions in the agreement concerning complete information.

There is no merit to the defendant's assertion that the date of the agreement should have been redacted (no specific request having been made). No reasonable juror would use the age of the agreement to infer any special knowledge of the prosecutor concerning the veracity of Yashica's testimony. The nonprosecution agreement was properly admitted in evidence as redacted to avoid references about the truthfulness of her information, and there was no impermissible vouching by the prosecutor for her credibility.[3]

4. The defendant argues that the judge improperly barred him from asking Yashica whether she knew that, by agreeing to testify in the Commonwealth's favor under the nonprosecution agreement, she avoided potential life sentences for murder in the first degree and for armed robbery.

A defendant's constitutional right to cross-examine witnesses to show bias is not absolute. See *Commonwealth* v. *Johnson*, 431 Mass. 535, 538 (2000). While a judge cannot bar all inquiry into the subject, a judge has broad discretion to determine the scope and extent of cross-examination. See *id.*; *Commonwealth* v. *Jackson*, 419 Mass. 716, 727 (1995). The judge allowed the defendant to ask Yashica whether she knew that she could face charges of murder and armed robbery, if she had played a more active role in the killing. Yashica acknowledged that, by testifying against the defendant, she knew she was avoiding all criminal liability for her participation in the crimes. The jury knew of Yashica's awareness that she faced very long sentences if prosecuted and convicted for her role in the crimes, and that she had a strong motive to testify for the prosecution. The judge did not abuse his discretion in excluding the testimony. See *Commonwealth* v. *Borans*, 379 Mass. 117, 150 (1979); *Com-*

---

[3]We note that the judge's instructions, twice given, focused the jury's attention on the need for caution in evaluating Yashica's credibility in light of incentives that could have influenced her testimony. *Commonwealth* v. *Ciampa*, 406 Mass. 257, 263-264, 266 (1989).

*monwealth* v. *Dougan*, 377 Mass. 303, 310 (1979). See also *Commonwealth* v. *Hicks*, 377 Mass. 1, 8 (1979).

5. The defendant's claim that the admission of certain testimony was in violation of the marital disqualification provision set forth in G. L. c. 233, § 20, lacks merit. General Laws c. 233, § 20, First, provides in pertinent part that "neither husband nor wife shall testify as to private conversations with the other." This rule is one of disqualification, not privilege, and spouses are forbidden, on objection, to testify about the contents of their private conversations. See P.J. Liacos, M.S. Brodin & M. Avery, Massachusetts Evidence § 13.2.1, at 766-769 (7th ed. 1999).

Prior to trial, the marital disqualification rule had been the subject of a motion in limine, and the judge had cautioned the prosecutor of the limitations set by G. L. c. 233, § 20. The alleged violation occurred when Detective Harris testified, over objection, that another police detective had received information from Yashica implicating her husband in the crimes. According to the defendant, the prosecutor asked Detective Harris, "Just yes or no, did the information relayed to you from Sergeant Detective Keeler [concerning what Yashica had told Keeler] implicate [the defendant] in the death of [the victim]?" Detective Harris answered, "Yes." Assuming the application of the marital disqualification rule in these circumstances,[4] there is no basis on which to conclude that Harris's testimony was based on the disclosure to Keeler of the contents of any private conversations between the defendant and his wife.

6. We decline to grant the defendant any relief under G. L. c. 278, § 33E. He was represented by competent trial counsel who presented the jury with the defendant's contention that Yashica committed the murder. The jury rejected the contention, and, with an adequate foundation in the evidence, found the defendant guilty of premeditated and felony murder and armed robbery.

---

[4] The marital disqualification rule arguably might not apply in circumstances where the communications are made at a time when both husband and wife are jointly engaged in criminal activity. See *United States* v. *Rakes*, 136 F.3d 1, 4 n.5 (1st Cir. 1998); *United States* v. *Mavroules*, 813 F. Supp. 115, 118-120 (D. Mass. 1993) (recognizing Federal crime-fraud exception to marital communications disqualification).

7. The order denying the defendant's motion for a new trial is affirmed. The judgments of conviction are affirmed.

*So ordered.*