NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-480

COMMONWEALTH

vs.

JULIUS E. CLEMENTE.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

Following a jury trial in the Superior Court, the

defendant, Julius E. Clemente, was convicted of possession with

intent to distribute a class A substance.[1]  Following an ensuing

jury-waived trial, the defendant was also convicted of

possession with intent to distribute a class A substance,

subsequent offense.  In view of the improper admission of the

defendant's prior convictions for possession with intent to

distribute, we vacate the judgments and remand for such

proceedings as the Commonwealth deems appropriate.

Background.  We recite the facts as the jury could have

found them at trial, reserving additional facts for discussion.

―――――――――――――

[1] The defendant was indicted for trafficking a class A substance but convicted of the lesser included offense of possession with intent to distribute a class A substance.

On April 16, 2021, Federal law enforcement officials from the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and Brockton Police officers executed a search warrant at the defendant's apartment in Brockton.  There had been an extensive investigation into the defendant's firearm and drug trafficking activities.  The defendant was the only person in the apartment at the time of the search.

The apartment had three bedrooms.[2]  Bedroom two was locked with a deadbolt and was removed from its hinges for officers to enter.  In that bedroom officers found, on a bureau, a digital scale and four plastic bags (baggies) containing a white powdery substance.  One baggie contained fentanyl and cocaine and weighed a combined 7.55 grams; a second baggie, weighing 0.43 grams, also contained fentanyl and cocaine; and the two other baggies, weighing 0.84 and 0.37 grams, both contained cocaine.  Inside of a nightstand in bedroom two, officers also found baggies and mail in the defendant's name.  In the same nightstand, officers found a notebook and an envelope, identified as drug ledgers, detailing drug-related sales and

_____

[2] At trial, witnesses referred to the bedrooms as "bedroom number one," "bedroom number two," and bedroom number three." Officers found evidence, described herein, in bedrooms two and three, but nothing of evidentiary value in bedroom one.

2

activity, including names, dollar amounts, drug weights, and drug-related terminology.[3]

In bedroom three, officers found two knotted plastic baggies on the bed, one containing four grams of a white powdery substance confirmed to be fentanyl, and the other a green leafy substance.  Officers also found a vehicle title from the Registry of Motor Vehicles bearing the defendant's name and address, and the defendant's daughter's birth certificate. Inside a bureau in bedroom three, officers found three rounds of nine-millimeter ammunition.

In the kitchen, officers found a bag containing a box of ammunition and "male clothing."  In the living room, officers found a spent shell casing underneath a couch, and a firearm lock in a shoebox.

The defendant was arrested and transported to the Brockton police station.  During the booking process, after hearing an officer advise another officer that the defendant was being charged with trafficking in fentanyl, the defendant asked, "how he was being charged with trafficking of fentanyl, the bag only weighed four grams."

---

[3] In bedroom two, officers also found items with the defendant's sister's name on them, personal items belonging to the defendant's sister, women's clothing, and "small amounts of men's clothing."

The Commonwealth also introduced evidence that the firearm and drug trafficking activities that were the subject of the investigation and search "were interlinked."  In one instance, for example, the defendant encouraged a drug purchasing customer who had a drug debt to "go buy firearms that [the defendant] could traffic to work off that drug debt."  The defendant also admitted to selling marijuana.  In addition, an expert witness testified regarding the packaging, distribution, and sale of fentanyl and cocaine, the relationship between firearms and drug dealing, and the use of digital scales in drug distribution operations.  He testified that the way the bags of white powdery substances were packaged was consistent with drugs packaged for street level narcotics distribution.  He also testified that the writing in the notebook and on the envelope found in bedroom two constituted records of drug purchases.

Finally, the Commonwealth introduced evidence in its case-in-chief of the defendant's two prior convictions for possession with intent to distribute a class A substance (fentanyl). Specifically, the Commonwealth elicited evidence that in July and August of 2018 -- approximately three years prior to the search and arrest in the present case -- police officers searched the defendant's home[4] and found a plastic bag containing

_____

[4] There is no dispute that the defendant lived in the same apartment in 2018 and 2021.

4

white powder, a "calibration weight," and a digital scale in the defendant's bedroom, and another digital scale and calibration weight inside the kitchen.[5]  Evidence of the defendant's prior convictions was admitted through the testimony of a police officer who participated in the July 2018 search of the defendant's home, a redacted audio recording of the defendant's plea colloquy, which included the prosecutor's recitation of facts, and copies of the docket sheets reflecting the defendant's prior convictions.[6]

Discussion.  1.  Prior conviction evidence.  Before trial, the Commonwealth moved in limine to admit evidence of the defendant's 2018 convictions for possession with intent to distribute fentanyl to prove knowledge and intent.  The defendant moved to exclude such evidence.  In a written order,

_____

[5] Regarding the July 27, 2018, search of the defendant's apartment, officers found a calibration weight, a digital scale with white powdery residue, and a baggie containing 0.083 grams of fentanyl.  Regarding the August 8, 2018 search, officers found a digital scale with fentanyl residue, a box of clear plastic bags, a suboxone strip, and 0.4 grams of a class B substance.

[6] After the Commonwealth rested its case-in-chief, the defendant's mother testified, inter alia, that bedroom three was the defendant's room, and her daughter occupied bedroom two and "always keeps her room locked."  The defendant's mother also testified that she visited shooting ranges for stress relief, and had brought shell casings from the shooting range to the apartment on prior occasions to "make a shadow box."

5

the judge denied the defendant's motion and, regarding the Commonwealth's motion, ruled as follows:

> "Allowed as to evidence of the defendant's 2018 convictions for Possession with Intent to Distribute, which may be admitted for the limited purpose of proving intent to distribute drugs in the instant case" (footnote omitted).

Later at trial, over objection, the Commonwealth introduced evidence of the defendant's guilty pleas and prior convictions in the manner described supra. At the time that the evidence was admitted, the judge instructed the jury:

> "So you just heard some evidence that the defendant allegedly was arrested and charged with a possession with intent to distribute a controlled substance offense. You'll -- and you're going to hear some more evidence about that. And essentially, that he pled guilty on two prior occasions in 2018, which is several years before this occasion, of course, that we're here to talk about, to possession of a controlled substance with intent to distribute.
>
> "This evidence is admitted only insofar as it may bear on issues of the defendant's state of mind or intent in this case. Like all evidence, it's up to you to decide whether to believe it or not and to decide what weight that evidence should have. The evidence is not introduced, however, to show that the defendant had a bad character or propensity for any sort of criminal behavior. You may not consider the evidence for those purposes. The defendant is not charged with committing any crime other than the charge contained in the indictments in this case.
>
> "And particularly, you [may] not take evidence of these other acts as a substitute for proof that the defendant committed the crimes charged in this case, nor may you consider it as proof that the defendant has a criminal personality or a bad character or had a propensity to commit the crimes with which he is charged in this case.
>
> "If you conclude that the Commonwealth has proved beyond a reasonable doubt that the defendant possessed a controlled

6

substance in this case, then you may consider the evidence of the prior offenses only, that is solely, on the limited issue of the defendant's state of mind or intent in this case. You may not consider this evidence for any other purpose. Specifically, you may not use it to conclude that if the defendant committed these other prior acts, he must have also committed the crimes charged in this -- in these indictments."

The judge provided a similar comprehensive limiting instruction to the jury in his final charge.

The defendant argues that the judge committed reversible error in admitting the prior convictions because they constituted inadmissible propensity evidence, and the risk of unfair prejudice outweighed the probative value of such evidence. In the context of this particular case, we agree.

"Generally, evidence of a defendant's prior misconduct may not be admitted to show bad character or propensity to commit the crime charged." Commonwealth v. Montez, 450 Mass. 736, 744 (2008). However, such evidence may be admitted, where relevant, "for other, permissible purposes, including, for example, to 'show a common scheme, pattern of operation, absence of accident or mistake, identity, intent, or motive.'" Id., quoting Commonwealth v. Helfant, 398 Mass. 214, 224 (1986). A judge's decision to admit such evidence will be upheld absent "palpable error." See Montez, supra.

Here, the admission of the prior convictions to prove the defendant's intent was improper. The prior convictions were

7

admitted to demonstrate that three years prior to possessing a modest amount of controlled substances in his bedroom, the defendant had likewise possessed a modest amount of the same controlled substance in his bedroom; that the defendant admitted in the earlier case to possessing that controlled substance with intent to distribute it; and thus the jury should conclude that he likewise must have had the same intent in this instance. This constitutes propensity evidence that does not satisfy the criteria for admission delineated in our precedent.

Commonwealth v. Gollman, 436 Mass. 111, 114 (2002), on which the Commonwealth relies, is distinguishable. There:

> "[t]he defendant, in the previous sales, used female accomplices, changed venues to conduct his sales (selling from two different apartments), and sold similar amounts of crack cocaine ('eight balls' and quantities larger than commonly possessed for personal use). At the time of his arrest, the defendant was in possession of 2.71 grams of crack cocaine (approximately one 'eight ball'), he was in the company of a female, in a vehicle (a venue different from his prior venues), and in possession of an operational pager."

Id. In Gollman, the demonstrable factual detail and similarity to the circumstances surrounding the crimes charged was "highly probative of [the defendant's] intent." Id. By contrast, in the present case there was minimal similarity in conduct or method of operation linking the prior convictions to the present circumstances. Although the presence of a digital scale in the home on each occasion somewhat bolsters the Commonwealth's

8

argument, there is nothing in the present case approaching the similarity and detail required under Gollman and our other cases. See Commonwealth v. West, 487 Mass. 794, 805 (2021) (for evidence to be sufficiently probative, "there must be a 'logical relationship' between the prior bad act and the crime charged" [citation omitted]); Gollman, supra at 114 (similarities "were significant and tended to evince [the defendant's] intent to distribute the cocaine in his possession"); Helfant, 398 Mass. at 227 (evidence that showed "a distinctive pattern of conduct . . . was relevant and material to the disputed issue of the defendant's intent"). Our conclusion is supported by the three year gap between the present case and the prior convictions.[7] Contrast Gollman, 436 Mass. at 115 ("previous sales occurred six and ten weeks prior to [the defendant's] arrest and were not so remote as to make them inadmissible").

We recognize that the judge provided, and repeated in his final charge, a thorough limiting instruction. Those instructions, however, were insufficient to overcome the

---

[7] We do not suggest that a three-year lapse between an indicted act and prior convictions renders the prior acts inadmissible. See Gollman, 436 Mass. at 115 ("there is no specific time limit on when a prior bad act can no longer be admissible"). We hold only that the lapse of time in the present circumstances, combined with the lack of "meaningfully distinctive" similarities between the conduct underlying the prior convictions and the crime charged, rendered the prior convictions inadmissible in this case. Id.

prejudice created by the admission of the propensity evidence. In this regard, we note that evidence of the defendant's intent to distribute was far from overwhelming in view of the amount of drugs recovered.[8]  Furthermore, the prejudice was exacerbated by the prosecutor's repeated use of the prior convictions in closing argument to urge the jury to convict based upon his prior intent, i.e., in this context his propensity.  See Commonwealth v. Howard, 469 Mass. 721, 744 (2014), S.C., 479 Mass. 52 (2018).

2.  Required finding.  The defendant also argues that evidence of the defendant's intent to distribute was insufficient.  We need not dwell at length on this claim.  "When a relatively small amount of drugs is at issue . . . additional evidence is generally required to prove an intent to distribute."  Commonwealth v. Ahart, 63 Mass. App. Ct. 413, 414-415 (2005).  See generally Commonwealth v. Wilson, 441 Mass. 390, 401-402 (2004); Ahart, supra; Commonwealth v. LaPerle, 19 Mass. App. Ct. 424, 427 (1985).  As detailed above, the Commonwealth introduced evidence including but not limited to

_____

[8] To be clear, the weight of the evidence here was and remains for the jury to decide.  Indeed, in view of the evidence elicited by the Commonwealth in its case-in-chief, summarized supra, the defendant's appellate claim that the judge erred in denying his motion for a required finding of not guilty is unavailing.  See infra.

10

the drugs found in the apartment including the defendant's bedroom, the individual packaging of drugs, additional materials used for packaging, the absence of paraphernalia for personal use, the admission by the defendant that he was a drug dealer (in marijuana), digital scale, and expert testimony.  This evidence, in its totality, sufficiently supported the reasonable inference that the defendant intended to sell the drugs in his possession.

3.  Search warrant.  The defendant also claims that the search warrant failed to provide any nexus between the alleged illegal activity and the home and was thus not supported by probable cause.  We disagree.

Under the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights, a search warrant may issue only on a showing of probable cause.  See Commonwealth v. Valerio, 449 Mass. 562, 566 (2007).  In evaluating whether a warrant application establishes probable cause, our inquiry "always begins and ends with the 'four corners of the affidavit.'"  Commonwealth v. O'Day, 440 Mass. 296, 297 (2003), quoting Commonwealth v. Villella, 39 Mass. App. Ct. 426, 428 (1995).  "To establish probable cause to search, the facts contained in an affidavit, and reasonable inferences that may be drawn from them, must be sufficient for the magistrate to conclude 'that the items sought are related to the

11

criminal activity under investigation, and that they reasonably may be expected to be located in the place to be searched at the time the search warrant issues.'" Commonwealth v. Walker, 438 Mass. 246, 249 (2002), quoting Commonwealth v. Donahue, 430 Mass. 710, 712 (2000). Probable cause does not require definitive proof of criminal activity. See Commonwealth v. Spano, 414 Mass. 178, 184 (1993). Instead, "[t]he basic question for the magistrate, when evaluating an affidavit supporting an application for the issuance of a search warrant, is whether there is a substantial basis on which to conclude that the articles or activity described are probably present or occurring at the place to be searched." Id. "In dealing with probable cause . . . we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent [people], not legal technicians, act." Commonwealth v. Hason, 387 Mass. 169, 174 (1982), quoting Brinegar v. United States, 338 U.S. 160, 175 (1949). Accordingly, a review of a search warrant affidavit shall be conducted in a realistic and commonsense manner. Donahue, supra.

Here, the search warrant affidavit of ATF Special Agent John Cook stated, inter alia, that: on January 3, 2021, an empty gun box for a Glock G42 pistol was thrown out of the driver's side window of a white sport utility vehicle (SUV);

Boston police officers were notified of this observation, responded, and seized the empty gun box; the serial number for the pistol was printed on the box; a search of an ATF database disclosed that on December 8, 2020, "Anisha Correa" had purchased that gun from a Bass Pro Shop in Hooksett, New Hampshire; the database also reflected that Correa had purchased three other handguns from Bass Pro Shop that same day; in January and February of 2021, Correa had purchased six additional guns from Bass Pro Shop; and Correa had purchased eight more guns from other New Hampshire gun dealers in March of 2021. In total, Agent Cook located the purchase of eighteen guns by Correa between December 2020 and March 17, 2021, at a cost of over $8,000. Agent Cook found no reports of those handguns "as being reported lost or stolen."

The affidavit reflects that Agent Cook spoke to employees at Bass Pro Shop, where Correa had made various gun purchases, and learned that on at least two occasions Correa was accompanied inside the store by a male identified by Correa, through still photographs taken from Bass Pro Shop surveillance footage, as the defendant; that Correa acknowledged that the defendant was her boyfriend; and that on some occasions Correa visited the Bass Pro Shop alone, but could be seen speaking on her cellphone while purchasing handguns. Part of the surveillance video viewed by Agent Cook showed Correa

13

accompanied by the defendant and further showed the defendant pointing at "several firearms stored in the gun cases" and appearing "to engage store personnel in discussion about the firearms."

The affidavit further stated that Correa agreed to be interviewed by Agent Cook; that they met on March 12, 2021; that Correa was evasive in responding to Agent Cook's questions; and that when asked about the location of the guns she had purchased, Correa stated, "somewhere," and "she did not store them in her residence because of her children."  Correa later gave Agent Cook the name of a fictitious storage facility where she alleged that she kept the guns.  Agent Cook then seized Correa's cellphone, examined the contents pursuant to a Federal search warrant, and found hundreds of text messages between Correa and the defendant between January and March of 2021.  The text messages referenced the purchase of various guns, the building of guns, and directions from the defendant to Correa to purchase certain guns for him to resell.  The text messages also contained the defendant's acknowledgment that he gave Correa money to purchase guns, and his acknowledgment that he "took the numbers off" a gun.  Agent Cook averred that people engaged in firearms trafficking remove serial numbers from firearms in an attempt to avoid detection.

There were messages from February of 2021 in which the defendant "made comments of committing acts of violence," to which Correa responded, "I hope you don't plan on doing something with your mom and sister in that crib.  Get them out and do what you gotta do."  Agent Cook confirmed that the defendant's mother and sister "both currently reside at" the same Brockton apartment as the defendant.  In a March 7, 2021, text message exchange involving the purchase of a particular gun, the defendant told Correa to use "[m]ixed bills not all big they'll give it to you right away."  "Later in the same conversation, [the defendant] instructed [Correa] to 'Go to mamas.'"

Finally, Agent Cook also discussed, based on his training and experience, the use of tools used to obliterate firearms, which are "relatively expensive" and "must be maintained in an environment where they will be secure from theft."  Based on the defendant's communications regarding the obliterating of serial numbers, Agent Cook believed there to be probable cause that such tools would have been located in the defendant's vehicle or residence.  Agent Cook further averred that people involved in building firearms generally keep receipts for parts and accessories in their residence or vehicles or on their person so that, if a problem occurs, they will have proof of purchase to show the manufacturer.

15

In view of the information in the search warrant affidavit, including that summarized above, there was a substantial basis for concluding that evidence connected to the crime would be found on the specified premises.  See Commonwealth v. Thevenin, 82 Mass. App. Ct. 822, 827 (2012).  The affidavit provided abundant evidence that the defendant purchased firearms through Correa; the defendant directed much of this activity and specified on many occasions which firearms to purchase; and the defendant took possession of those firearms, as evidenced by his text messages to Correa describing the sale of a Taurus G3 pistol on January 14, 2021 ("Bye bye g3"), and how he had made a "1300$ flip off those ones" in reference to a Glock 19X pistol on January 23, 2021.  The inference of the defendant's connection to firearms and tools and materials related thereto was bolstered by the text messages, which showed that the defendant directed the operation and told Correa what to purchase.  Moreover, the affidavit established that the defendant told Correa to purchase a handgun and then "Go to mamas."  In view of the evidence that the defendant lived with his mother, a reasonable inference was that the defendant was instructing her to bring the gun to the apartment he shared with his mother.  See Thevenin, supra.  See also Commonwealth v. Defrancesco, 99 Mass. App. Ct. 208, 213 (2021) ("a search warrant affidavit may establish probable cause that evidence

16

could be found in more than one location").  Finally, the search warrant affidavit contains abundant evidence that the defendant was involved in an ongoing pattern of criminal conduct, and thus there was further reason to believe that the evidence of durable items of continuing utility, such as guns, gun parts, and tools to remove serial numbers, would remain in the defendant's possession at "mamas."  See Thevenin, supra; Commonwealth v. Scanlan, 9 Mass. App. Ct. 173, 181 (1980).  The judge did not err in denying the motion to suppress.

The judgments are vacated.  The verdict on the charge of possession with intent to distribute is set aside, as is the finding on the related subsequent offense charge.  The case is remanded for such further proceedings as the Commonwealth deems appropriate and as are consistent with this memorandum and order.

So ordered.

By the Court (Neyman, Shin & Wood, JJ.[9]),

Clerk

Entered:  August 22, 2025.

---

[9] The panelists are listed in order of seniority.

17